## BURTON v. BURTON.

1. Principal and Agent—Evidence.
Evidence was sufficient to support trial court's finding of fact that uncle of one of the plaintiffs, a defendant, was such plaintiff's agent for the collection of rents of apartment house property while plaintiff was out of the State.

2. Same—Duties of Agent.
The agent is a fiduciary and owes to his principal the duty of good faith and loyalty, to use care, skill and diligence and to obey the instructions of his principal.

3. Same—Dealing in Subject Matter on Agent's Own Account.
It is a settled principle of equity that where a person undertakes to act as an agent for another, he cannot be permitted to deal in the subject matter of that agency upon his own account and for his own benefit.

4. Same—Definition of Agent.
An agent is a person having express or implied authority to represent or act on behalf of another person, who is called his principal.

---

References for Points in Headnotes

[1]  2 Am Jur, Agency § 443.
[2]  2 Am Jur, Agency § 252.
[3]  2 Am Jur, Agency § 253.
[4, 5]  2 Am Jur, Agency §§ 2, 3.
[6]  2 Am Jur, Agency §§ 423, 424.
[7, 8]  54 Am Jur, Trusts §§ 225, 226.
[9, 10]  2 Am Jur, Agency § 261; 54 Am Jur, Trusts § 228.
[12]  1 Am Jur, Accounting § 65.
[13, 14, 17, 19]  19 Am Jur, Equity §§ 514, 515.
   Pleading laches.  173 ALR 326.
[15, 16]  2 Am Jur, Agency §§ 288, 289
[18]  1 Am Jur, Accounting § 56.
[20, 22]  1 Am Jur, Accounting § 59.
[21]  54 Am Jur, Trusts §§ 228, 266.

5. SAME—POWERS, DUTIES AND APPOINTMENT OF AGENT.

An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by authority and on account of latter and to render an account of it; one who is a substitute or deputy, appointed by the principal, with power to do the things which the principal may or can do.

6. TRUSTS—ACCOUNTABILITY OF AGENT—PROFITS.

In equity if an agent is found to have acquired any pecuniary advantage to himself from third parties by means of his fiduciary character, he is accountable to his employer as a trustee for profits he has made.

7. SAME—CONSTRUCTIVE TRUSTS—CREATION.

A constructive trust is raised by a court of equity wherever a fiduciary gains some personal advantage by availing himself of his situation as trustee.

8. SAME—CONSTRUCTIVE TRUSTS—EQUITY—FRAUD.

Equity will impress a constructive trust on property in favor of a claimant in equity, when it is shown that the title has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property and there are no intervening rights of bona fide purchasers.

9. PRINCIPAL AND AGENT—AGENT'S DEALING IN SUBJECT MATTER ON OWN ACCOUNT—TRUSTS.

One who undertakes to act as agent for another cannot be permitted to deal in the matter upon his own account and for his own benefit, and if he takes land in his own name he will in equity be considered as holding it in trust for his principal.

10. EQUITY—PRINCIPAL AND AGENT—CONSTRUCTIVE TRUSTS.

Equity will compel an agent or fiduciary who takes a title in his own name to transfer the title to the party equitably entitled to it or subject the lands to proper trusts, whether title is taken by such party in his own name in good faith, under the belief that he can better manage the property to the advantage of those for whom he is acting or in compliance with their wishes, or whether from an intention to defraud them of their rights therein.

11. PRINCIPAL AND AGENT—VIOLATION OF AGREEMENT BY AGENT—EVIDENCE.

Finding of fact that defendant, an uncle of plaintiff, violated agency agreement as to collection of rents from apartment house, was supported by evidence.

12. ACCOUNTING—FINDINGS OF TRIAL COURT—DISPUTED TESTIMONY.

Trial court's findings on probable amount of money defendant agent had collected in rents for plaintiff are adopted in suit for accounting, where the amount was disputed, since the trial court had the better opportunity of appraising the credibility of the testimony of witnesses.

13. EQUITY—LACHES A SPECIAL DEFENSE WHICH MUST BE PLEADED.

Laches is a special defense which must be pleaded.

14. SAME—LACHES—PLEADING.

Claim of laches, asserted on appeal, is not tenable, where such defense was not pleaded, hence various claims that circumstances were altered as to defendants before plaintiffs commenced their suit for accounting, may not be considered.

15. PRINCIPAL AND AGENT—AGENT CANNOT DENY PRINCIPAL'S TITLE.

An agent shall not be heard to deny the title of his principal.

16. ACCOUNTING—WAIVER—PRINCIPAL AND AGENT—THIRD PERSONS.

Alleged waiver by plaintiffs of any failure to account by defendant uncle as to rent collected by him during nephew plaintiff's absence from the State and afterward *held*, not effected by such plaintiff's assignment of his vendee's interest in the premises to a third party, by his failure to make payments on the land contract, failure to record a quitclaim deed from defendant uncle and his wife and by plaintiffs' failure to perform their obligations under various contracts involved, where defendant uncle occupied position of agent to such plaintiff for collection of rents, since the relation of the plaintiff to others does not relieve an agent from performing his duty to his principal.

17. SAME—LACHES—PLEADING.

Claim of laches in that plaintiffs remained passive while defendants assumed risks, made expenditures and improved the property may not be urged in suit for accounting, where laches was not specially pleaded.

18. SAME—RECEIPTS—RELEASE.

A receipt for rents received to a given date does not effect a release of party continuing to receive such rents thereafter

from accounting therefor, especially where it is not claimed such receipt effected an accord and satisfaction.

19. SAME—LACHES—PLEADING.

Claim of laches in that plaintiffs were guilty of speculative delay in that they withheld their claim of right to accounting by defendant uncle awaiting outcome of the enterprise may not be considered, where laches was not specially pleaded.

20. SAME—PARTIES—DISCONTINUANCE.

Order of discontinuance, entered as to wife of party from whom plaintiffs sought to obtain an accounting, was proper, since she was not a necessary party to the suit (CL 1948, § 612.13).

21. TRUSTS—PRINCIPAL AND AGENT—BETRAYAL OF TRUST—CONVEYANCE FROM TRANSFEREE NOT A BONA FIDE PURCHASER.

Title which defendant uncle acquired in betrayal of his trust to plaintiff nephew and which he transferred to corporation of which he was president and which corporation is not a bona fide purchaser is in equity held in trust for plaintiffs, hence they are entitled to conveyance from the corporation.

22. JUDGMENT—PARTIES.

Interests of persons in property involved in suit for accounting are not determined in such suit, where they were either not parties thereto or were not necessary parties and suit was discontinued as to them (CL 1948, § 612.13).

Appeal from Wayne; Brennan (Vincent M.), J. Submitted October 4, 1951. (Docket No. 30, Calendar No. 45,198.) Denied January 15, 1952. Rehearing denied March 6, 1952.

Bill by Norsco Burton and wife against William Burton and others for accounting and other relief. Decree for plaintiffs. Defendants appeal. Affirmed.

*Berger, Manason & Kayes,* for plaintiffs.

*M. D. Smilay,* for defendants.

SHARPE, J. This is an appeal from a decree awarding an apartment building in the city of Detroit to plaintiffs based upon an accounting.

Prior to March 1, 1946, Yetta Levin was the owner of the apartment building containing 6 apartments. The building was in need of repairs and she, not being willing or able to make the necessary expenditures to repair or remodel the building, entered into a preliminary agreement with plaintiffs for its sale to them. It appears that by virtue of the preliminary agreement, plaintiffs took possession of the premises in October, 1945. On March 1, 1946, a land contract was executed between the parties whereby Yetta Levin sold the premises to plaintiffs for the sum of $4,750 payable at the rate of $47.50 per month with interest at 6%, all payments to be made within 10 years. Upon taking possession, plaintiffs collected rents from March 1, 1946, to June 1, 1946, in the amount of approximately $500, but made no payments on the contract as required by the land contract. Following the execution of the preliminary agreement in October, 1945, plaintiffs made an attempt to raise sufficient funds to repair and remodel the apartment building as required by the agreement. Plaintiff Norsco Burton approached his cousin Rufus Burton and borrowed the sum of $1,500. In return for such loan, Norsco Burton assigned to Rufus Burton all of his right, title and interest in and to the preliminary agreement. This assignment was made in the latter part of October or November, 1945, and later was returned to Norsco Burton without a written assignment. Approximately $500 of the borrowed money was expended in repairs on the apartment.

Prior to June, 1946, William Burton, one of the defendants and uncle of Norsco Burton, had acquired extensive interests in lands in Mississippi and desiring information of its potential timber, oil and mineral values, sent plaintiff Norsco Burton to Mississippi for such purposes. Norsco Burton left Detroit on June 12, 1946. Before leaving, Norsco

Burton requested William Burton to collect rents from the tenants in the apartment building.

Because of William Burton's difficulty in collecting rents, Norsco Burton and wife executed a quitclaim deed of the property to William Burton and Dorothea Burton, his wife. At the same time William Burton and wife executed a quitclaim deed of the property back to plaintiffs. On July 22, 1946, because no payments had been made to Yetta Levin as required by the contract, she began proceedings to forfeit the land contract before a circuit court commissioner in Wayne county. On December 13, 1946, the last day on which the property could be redeemed, Lora Lee Thomas, William Burton's secretary, paid the sum of $450.59 to the circuit court commissioner and redeemed the premises in the name of Norsco and Lula Burton. On October 10, 1946, William Burton and wife executed a quitclaim deed of this property to Lora Lee Thomas.

On March 11, 1947, Yetta Levin entered into a contract for the sale of the premises to William Burton and Dorcatha Burton for the sum of $4,495.22 payable at the rate of $47.50 per month with interest at 6%. Attached to the land contract was the following:

"It being understood that any and all payments, when due, shall be made to seller at her address at 2727 Elmhurst avenue, Detroit 6, Michigan, or wherever else or to whomever else seller may designate.

"Purchaser agrees to hold seller harmless from any claims of whatsoever nature, which may arise from the sale of this property to him, and in particular any claim which Norsco Burton and Lulu H. Burton might have against seller by virtue of a previous land contract dated March 1, 1946, between

Yetta Levin and Norsco Burton and Lulu H. Burton, his wife.

"William Burton

"Doreathea Burton atty. in fact."

On June 6, 1947, William Burton and wife executed a quitclaim deed of the premises to Interstate (Industrial) Investment Corporation of Detroit, Michigan. William Burton is president and stockholder of the Industrial Investment Corporation, which was incorporated in June, 1947.

It also appears that Norsco Burton returned from his mission in Mississippi in March, 1947; and some time after his return demanded an accounting of the rents collected during his absence.

On December 22, 1947, he signed the following receipt:

"Received of W. M. Burton in full settlement for any and all rents collected from building located at 1836 Canfield for me by him or Lora Lee Thomas also I promise to pay to the order of Lora Lee Thomas the sum of $128.50 on or before the 25th day of December 1947. Which she has loaned to me above date."

Following the so-called settlement of December 22, 1947, William Burton commenced an action to recover the money advanced to Norsco Burton while in Mississippi. On February 25, 1948, Norsco Burton and wife, Lula Burton, filed a bill of complaint against William Burton, Doreatha Burton and Industrial Investment Corporation for an accounting. On February 11, 1949, a discontinuance as to Doreatha Burton was filed.

The cause came on for trial and evidence was introduced by defendant William Burton that he had expended upwards of $12,000 in repairs and improvements on the premises after March 11, 1947.

The trial court entered a decree awarding the premises to plaintiffs.

The trial court filed an opinion in which he found as a fact:

"I find as a fact that Norsco Burton is and has been a person far below the average in intelligence. His testimony indicated that he did not understand what dealings he was having with his uncle, William Burton. It is my holding that the uncle took advantage of Norsco, and defrauded him out of his interest in the Canfield property.  *  *  *

"It is my determination that Norsco Burton should reimburse William Burton for any actual expenditures made by way of repairs or improvements to the property in question. However, Norsco is entitled to credit for the rents actually collected by William over the period of time from June, 1946 to date. Plaintiff claims that that sum totals $15,065.45 up to January 31, 1950. There is a dispute as to the rents collected in 1946. The court finds as a fact that the rents actually collected were as claimed by the plaintiff, $75 in June, and $150 a month for each of the succeeding months. I find that the testimony of Lora Lee Thomas Burton in regard to the rents received is untrue, and not in conformity with the actual facts. It is a matter of common knowledge that tenants occupying premises during the period of 1946, and particularly when they were holding from a landlord of the type of William Burton, paid their rent in full or were evicted. I cannot conceive that William Burton would have permitted these tenants to remain in the premises without paying their rent. We have the testimony of at least 2 tenants to the effect that they paid their rent in full, and this court holds that the rent was so collected during 1946. We have record testimony furnished by the defendants as to the rents collected in 1947 and 1948, taken from a ledger book, beginning January of 1948. The court finds that those figures are

correct, and the defendants will be required to account for the rents so collected.   *   *   *

"The court will find that the defendant, William Burton, is entitled to retain the furniture in this property, and whatever difference there is in value between the house with furniture and without the furniture, the court will award to William Burton by way of a fee for having spent his time in managing the property during the period of 2½, almost 3 years. So that the defendant William Burton will have a right to remove the furniture.   *   *   *

"The court holds that the moneys paid to Norsco by William, by way of telegraph, while Norsco was in the south, were actually for expenses incurred by Norsco. Norsco admits receiving this money, and he takes the position that he expended the same, and also additional sums, in the furtherance of the venture in the south. He has made a claim, in his cross-declaration, that William agreed to pay him $600 a month over and above all expenses. On the witness stand he said the agreement was $150 a week. The testimony of William is in direct conflict with the testimony of Norsco. William's claim is that Norsco was to be paid a 5% commission over and above expenses. The court finds that the arrangement was as claimed by William: That nothing having been realized for the trip to the south made by Norsco, he is not entitled to collect any sum therefor; but, on the other hand, it is my view that William advanced the moneys to Norsco, hoping to realize large profits from the acquisition of the Mississippi property. In a sense it was a gamble; nothing having been realized, and Norsco having spent the better portion of 1 year in the south in the interests of William and himself, the moneys advanced by William will be considered to have been paid to Norsco for expenses and living costs. A judgment of no cause of action is accordingly entered."

Defendants appeal and urge that the trial court was in error in finding as a fact "that William Bur-

ton, as agent, violated his trust to his principal, Norsco Burton, and, in substance, tried to take from Norsco Burton the property which Norsco had bought from Yetta Levin on land contract."

By agreement of the parties, the trial court considered the testimony involved in the law case in considering the issues in the chancery case. The record is not as complete as it should be. Exhibits mentioned in the testimony are not included in the record. The following comment of the trial court made while Lora Lee Thomas Burton was testifying was fully justified:

"*The Court:* Well, I think the testimony of this witness, like the testimony of William and Norsco, is practically worthless, and I think we are wasting a lot of time of the court and of counsel in taking testimony in this case, because it is a lot of nonsense. These people apparently don't know what they are talking about. * * *

"*Mr. Schwartz:* I object to the characterization of Norsco Burton's testimony as worthless. I think—

"*The Court:* I don't think all of it was, but I think some of it was."

It is an accepted fact that Norsco Burton purchased the property in question from Yetta Levin on a land contract; that when Norsco Burton went to Mississippi for William Burton some arrangements were made whereby William Burton was to collect the rents and make payments on the land contract to Yetta Levin; that on March 11, 1947, when William Burton and wife entered into a land contract for the purchase of the premises from Yetta Levin there was an attached rider to the contract recognizing that plaintiffs had existing rights based upon their contract of March 1, 1946; that the cost of repairs and improvements was from $12,000 to $14,000; and that the rents collected possibly exceeded the cost of repairs and improvements.

The agency agreement finds support in the testimony of William Burton:

"*A.* I started several cases in the circuit court commissioner's court. The circuit court commissioner ruled that I had no right to collect rent or either come into court to collect them because I had no authority. I sent for Norsco to come back from Mississippi to make some way for me to collect the rents for him. He came back and made a quitclaim deed to me. The same day I give one back because I didn't—there was no loan or nothing, and it was only for the purpose of going into court and collecting the rents, and I give him one back immediately; the same time one was made the other was made.

"I only taken the quitclaim deed to show the court that he had transferred the property to me· and I had the right to collect the rent. I give him one back showing that he wasn't—showing that it was his property right on, to protect him I did give him one back and he goes back to Mississippi.

"*Q.* But your efforts to collect rent were on behalf of Mr. Norsco Burton, is that correct, in 1946?

"*A.* It was made purposely for me to collect rents for him.

"*Q.* And you were to collect these rents for whose benefit?

"*A.* Collecting the rents for Norsco.

"*Q.* So that in 1946 you attempted to collect rents on this property for the benefit of Norsco Burton; is that correct?

"*A.* Yes."

In our opinion, the above admission of William Burton affords sufficient testimony for a finding of fact that William Burton was the agent of Norsco Burton insofar as the collection of rents are concerned.

The relationship between principal and agent is well defined in 2 Am Jur, where it is said:

"There are certain well-defined duties and liabili-
ties which the agent owes to the principal. The
agent is a fiduciary and owes to his principal the
duty of good faith and loyalty. The agent is under
the duty to use care, skill, and diligence, and to obey
the instructions of his principal." (p 202)

"It is a settled principle of equity that where a
person undertakes to act as an agent for another,
he cannot be permitted to deal in the subject matter
of that agency upon his own account and for his own
benefit." (p 210)

In *Stephenson* v. *Golden,* 279 Mich 710, 734, 736,
738, 743, 745, we had occasion to discuss the rela-
tionship between principal and agent and there
quoted the following with approval:

" 'An agent is a person having express or implied
authority to represent or act on behalf of another
person, who is called his principal.' Bowstead on
Agency (4th ed), p 3.

" 'An agent is one who acts for or in the place of
another by authority from him; one who under-
takes to transact some business or manage some af-
fairs for another by authority and on account of
the latter, and to render an account of it. He is a
substitute, a deputy, appointed by the principal, with
power to do the things which the principal may or
can do.' 2 CJS, p 1025.     *     *     *

" 'It is a general principle of equity that if an
agent acquire any pecuniary advantage to himself
from third parties by means of his fiduciary charac-
ter, he is accountable to his employer as a trustee
for the profit that he has made.' Maitland's Equity
(2d ed), p 81.     *     *     *

" 'A constructive trust is raised by a court of
equity wherever a person, clothed with a fiduciary
character, gains some personal advantage by avail-
ing himself of his situation as trustee; for as it is
impossible that a trustee should be allowed to make
a profit by his office, it follows that so soon as the
advantage in question is shown to have been ac-

quired through the medium of a trust, the trustee, however good a legal title he may have, will be decreed in equity to hold for the benefit of his *cestui que trust.*' Lewin on Trusts (13th ed), p 191. * * *

" 'When it is shown that title has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property, and there are no intervening rights of bona fide purchasers, equity will impress a constructive trust on the property and turn it over to the one to whom it rightfully belongs.' *Racho* v. *Beach,* 254 Mich 600. * * *

" 'One who undertakes to act as agent for another cannot be permitted to deal in the matter upon his own account and for his own benefit, and if he takes land in his own name he will in equity be considered as holding it in trust for his principal.' 3 Reed on Statute of Frauds (1st ed), § 959, p 61. * * *

" 'If one takes a title in his own name, whilst acting as agent, trustee or guardian, or in any other fiduciary capacity, a court of equity will, upon a showing of the fact in an appropriate proceeding, subject the lands to proper trusts in his hands or compel him to transfer the title to the party equitably entitled to it. Nor does it matter whether the party takes the title in his own name in good faith, under the belief that he can thereby better manage the property to the advantage of those for whom he is acting, or in compliance with their wishes, or whether from an intention to defraud them of their rights therein.' * * * *Sanford* v. *Sanford,* 139 US 642 (11 S Ct 666, 35 L ed 290)."

See, also, *Trippensee* v. *Rice,* 312 Mich 233; *Mackey* v. *Baker,* 327 Mich 57.

Having in mind the duty of William Burton in acting as the agent of Norsco Burton, we are of the

opinion that the record justifies a finding of fact that William Burton violated the agency agreement with Norsco Burton and should account to Norsco Burton for moneys received and expenses incurred in repairing and remodeling the apartment. We note that there is a dispute as to the amount of rents collected. We adopt the findings of the trial court on the probable amount of money that defendant William Burton received as rents. The rule that the trial court has a better opportunity of appraising the credibility of the testimony of witnesses than an appellate court is particularly applicable in this case.

It is also urged that plaintiffs were guilty of laches in failing to act for a period of 11 months after Norsco's return to Detroit from Mississippi. We note that the defense of laches was not pleaded by defendants as a special defense. In *Abel* v. *Wayne County Sheriff*, 320 Mich 616, we said: "The contention, in effect, is that plaintiffs have been guilty of laches. However, laches is a personal defense which must be pleaded, and as no answer has yet been filed by defendants, that question may not be considered at the present time." The above authority is fatal to defendants' claim of laches.

It is also urged that the trial court ignored all evidence of waiver on the part of plaintiffs in the following particulars:

"(a) Assignment by plaintiff of purchase agreement to Rufus Burton.

"(b) Failure by plaintiffs to make any payments on contract to Yetta Levin.

"(c) Failure by plaintiffs to record quitclaim deed from William Burton and Doreatha Burton, his wife.

"(d) Failure by plaintiffs to contact Yetta Levin after timely knowledge of execution of land contract

between Yetta Levin and defendant William Burton and his wife Doreatha Burton.

"(e) Plaintiffs' inability to perform their obligations under several agreements.

"(f) Plaintiff Norsco Burton accepting employment with defendant Industrial Investment Corp.

"(g) Plaintiffs' remaining passive while defendants incurred risks, entered into obligations, making expenditures in improving the property, making payments on contract and paying taxes.

"(h) Plaintiffs accepting settlement for rents collected by defendants."

In *Stephenson* v. *Golden, supra,* at page 760, we quoted with approval from 21 RCL, p 831: "It is an elementary rule in the law of agency, applicable alike in civil and criminal proceedings, that the agent shall not be heard to deny the title of his principal." The above authority disposes of defendants' claim of waiver based upon an assignment of agreement to Rufus Burton; failure of plaintiffs to make payments to Yetta Levin; failure of plaintiffs to record quitclaim deed from William Burton; and plaintiffs' inability to meet their obligations under various contracts.

The claim that plaintiffs remained passive while defendants assumed risks, made expenditures and improved the property properly belongs under consideration of the defense of laches which has already been disposed of.

Defendants also urge that plaintiff Norsco Burton having accepted a settlement for rents collected, waived any claim he had against defendant William Burton. This claim is based upon the following receipt:

"December 22, 1947

"Received of W. M. Burton in full settlement for any and all rents collected from building located at 1836 Canfield for me by him or Lora Lee Thomas

also I promise to pay to the order of Lora Lee Thomas the sum of $128.50 on or before the 25th day of December 1947. Which she has loaned to me above date."

According to the testimony of defendant William Burton and defendants' theory that Norsco Burton had no interest in the property, the so-called settlement receipt covered, at most, the period from the time William Burton undertook to collect the rents (after June 12, 1946, when Norsco Burton went to Mississippi) to March 11, 1947, when William Burton entered into a land contract with Yetta Levin. There is no claim that the so-called settlement of December 22, 1947, was an accord and satisfaction. The most that can be claimed for it is a settlement to March 11, 1947, when William Burton claimed ownership of the property. It is an accepted fact that rents were collected after the above date, hence such receipt cannot be considered as a release of all claims of Norsco Burton against William Burton. The trial court in his opinion did not discuss this claim, but in his decree inferentially holds against defendants. We concur in that holding.

Defendants also urge that plaintiffs were guilty of speculative delay in that they withheld their claim awaiting the outcome of the enterprise. This claim was disposed of under the discussion of the defense of laches.

It is also urged that Doreatha Burton, Yetta Levin, Rufus Burton and Lora Lee Thomas Burton were necessary parties to this cause. Doreatha Burton was made a party defendant when the suit was begun in the circuit court of Wayne county. The record shows that she was the wife of William Burton and on June 6, 1947, joined William Burton in a deed of the property to the Interstate (Industrial) Investment Corporation, one of the defendants here-

in. The order of discontinuance as to Doreatha Burton was proper.

Section 612.13, CL 1948 (Stat Ann § 27.665), provides that:

"No action at law or in equity shall be defeated by the non-joinder or mis-joinder of parties. New parties may be added and parties mis-joined may be dropped, by order of the court, at any stage of the cause, as the ends of justice may require."

The present suit is not to quiet title, but is for an accounting by William Burton to Norsco Burton. We have held that whatever title to the property William Burton acquired in betrayal of his trust is in equity held in trust for plaintiffs. William Burton having conveyed his interest in the property to the Industrial Investment Corporation which is not a bona fide purchaser, plaintiffs are entitled to a conveyance from defendant Industrial Investment Corporation. Doreatha Burton, Yetta Levin, Rufus Burton and Lora Lee Thomas Burton were not necessary parties to this suit for an accounting and their interests, if any, in the property have not been determined.

Other claims made by defendants have been considered. None of them is controlling or presents any reason why the decree of the trial court should be reversed. The testimony in the case at bar is conflicting. There is some corroborative proof on behalf of each party. The trial court had the burden of separating the wheat from the chaff. After a careful analysis of all the evidence, we conclude that there is competent evidence to sustain the trial court. In coming to our conclusions we are somewhat influenced by the fact that the trial judge had

the additional advantage of seeing and hearing the witnesses.

The decree is affirmed, with costs.

NORTH, C. J., and DETHMERS, BUTZEL, CARR, BUSH-NELL, BOYLES, and REID, JJ., concurred.